THE MACHIGONNE.

(Circuit Court of Appeals, First Circuit. February 15, 1916.)

No. 1144.

COLLISION ⬅➡56—OVERTAKING STEAM VESSELS—FAULT.

Evidence *held* not to sustain the claim of a steamer which, on a slightly crossing but nearly overtaking course, had' come into collision with and sunk a smaller and slower motor-propelled schooner, that the latter changed her course just before the collision and was chargeable with contributory fault.

[Ed. Note.—For other cases, see Collision, Dec. Dig. ⬅➡56.]

Appeal from the District Court of the United States for the District of Massachusetts; James M. Morton, Judge.

Suit in admiralty for collision by Jacob F. Brown, owner of the fishing schooner Priscilla, and others, against the steamer Machigonne; Boston, Nahant & Pines Steamboat Company, claimant. Decree for libelants, and claimant appeals. Affirmed.

⬅➡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Edward E. Blodgett and Albert T. Gould, both of Boston, Mass. (Blodgett, Jones, Burnham & Bingham, of Boston, Mass., on the brief), for appellant.

G. Philip Wardner, of Boston, Mass., for appellees.

Before PUTNAM, DODGE, and BINGHAM, Circuit Judges.

DODGE, Circuit Judge. The owner of the fishing schooner Priscilla, of Boston, together with her master on the trip below mentioned, filed this libel, on behalf of themselves and of her crew on the same trip, against the steamer Machigonne, of Boston, to recover damages for the sinking of the schooner, caused by a collision between the two vessels in the upper harbor of Boston on June 24, 1913.

In the District Court the Machigonne was held solely in fault. Her owner and claimant, the Boston, Nahant & Pines Steamboat Company, appeals from the decree; not contending that she should have been held free from fault, but contending that the schooner should have been held also in fault.

The Priscilla, though ordinarily a schooner, had a gasoline motor engine, by whose power alone she was being propelled. Her sails were furled. For the purposes of the applicable Inland Rules, therefore, the collision was between two "steam vessels," not between a "steam vessel" and a "sailing vessel." See the "preliminary" paragraph of the Rules, 30 Stat. 96 (Comp. St. 1913, § 7873).

The collision happened a little before one o'clock in the afternoon, the weather being clear, the water smooth, and the wind light. Having left T Wharf shortly after noon, the Priscilla was proceeding down the harbor, bound outward on a sword-fishing trip, but intending to stop on the way at a station near Commonwealth Dock, in South Boston, to take on board a supply of gasoline. The Machigonne, a passenger boat making regular trips between Boston and Nahant, had left her dock at Otis Wharf at about 25 minutes before 1 o'clock, also bound down the harbor, on her way to Nahant. The collision was at a point near Channel Buoy No. 7, a black buoy on the southerly edge of the deep-water channel, and somewhat above Commonwealth Dock. This buoy is just about half a mile from a point off T Wharf; and a very little less than half a mile from a point off Otis Wharf. From the first-mentioned point it bears about southeast by south; from the second, about east southeast. The above facts are not disputed, and it is admitted by the pleadings that the Machigonne's bow collided with the Priscilla's stern near the last stanchion aft, on the starboard side, cutting into her so that she filled and sank shortly afterward.

Both vessels had the tide, which was flood, against them. Up to a time when collision was imminent, the Machigonne's speed had been from 10 to 12 knots; the Priscilla's from 3 to 4.

The Priscilla was being steered by her master; four of her crew were on deck, one of them being on lookout forward. All of these testified as witnesses at the trial. In the Machigonne's pilot house were her captain, pilot and quartermaster, all of whom testified at the trial, as did also her engineer, who was below. She had no lookout

stationed forward of her pilot house, which was 40 feet aft from her stern. There were no other witnesses from on board her.

While on their way toward the place of collision, both vessels had had in view ahead of them a large coal-laden steamer, the Malden, which had been anchored on the southerly side of the deep-water channel, about off the Commonwealth Dock, and not far below Buoy 7. The Malden was seen to be getting up her anchor and getting under way as they approached her. With both the Machigonne and Priscilla, it had been a question on which side of the Malden to head.

The schooner had covered a good part of the distance between T Wharf and Buoy 7, before the steamer started, and was the first of the two vessels required to shape her course with reference to the Malden. Her master, according to his own testimony, having steered southeast by south from off T Wharf, changed this course to about southeast by east under a port helm, which would have carried him outside the Malden, had that vessel not gathered a speed exceeding the schooner's and gone down channel at a faster rate, before the schooner came up with her. Finding that she would not have to pass the Malden, he brought the schooner back to her original course of southeast by south, which he then maintained until the collision without further change. At the time this last change of helm was made, he saw the Machigonne coming after him at a considerable distance behind the schooner, further from her than the schooner was from the Malden, and bearing over the schooner's starboard quarter.

We find no reason to doubt that this testimony truly states the relative positions of the two vessels at the time; and if there was no further change of course on the schooner's part, the Machigonne was solely to blame for striking the schooner. The respective courses and speeds of the two vessels involved risk of collision; she was the overtaking vessel, she had time and room enough in which to keep clear, and might easily have done so if due care on her part had been used. To escape this result, the steamer is obliged to rely upon a claim that the schooner, instead of maintaining her course down channel, suddenly changed it so as to head toward the South Boston shore, directly across the steamer's course, when the vessels were so close to each other as to leave the steamer no opportunity of avoiding collision.

We find nothing in the evidence from the schooner as a whole, whatever the discrepancies it contains, sufficient to establish or materially assist this claim, and the witnesses from the steamer are not in a position to establish it, for the reason that, on their own statements, they were not watching the schooner or her movements, and first became aware that she was dangerously near them when they found themselves in imminent danger of collision with her. The only lookout being kept on board her was from her pilot house, and of the three persons there, only two were concerning themselves with the steamer's navigation or with any other vessel in sight. These were the pilot, who was steering, and the captain, standing on the starboard side of the wheel. The quartermaster, on the other side of the wheel, was busy with a book wherein he was setting down the number of passengers.

According to the pilot's testimony, the steamer's course was east southeast from off Otis Wharf, with the Malden very nearly ahead, a trifle, if anything, on the starboard bow. Intending at first to leave the Malden on his port side and pass between her and Commonwealth Dock, the steamer's helm was ported a little, but while answering this change of helm, the Malden was found to be also directing her course to starboard. Fearing that there might not be room enough to pass her on that side, there being other vessels at anchor in that direction further down, the helm was changed to starboard sufficiently to put the steamer on a course carrying her outside the Malden, and then steadied. It was after this had been done that he first saw anything of the schooner. She was then, according to him, not over 300 feet away, crossing the steamer's course almost at right angles and swinging to starboard. Although the engines were at once reversed and the wheel put hard to starboard, collision followed, the vessels being nearly at right angles when the steamer's bow hit the schooner as above.

According to the captain's testimony, he had noticed the schooner going down stream while backing his steamer out from Otis Wharf. How far down she then was, he does not say. He appears to have taken little notice of her then, and no further notice of her until he discovered her, a few seconds after the pilot had headed the steamer so as to go outside the Malden, on the steamer's port bow, crossing her course, heading as if to pass under the Malden's stern, and so near as to cause him to signal instantly for full speed astern and order the steamer's wheel hard to starboard. The vessels struck, according to him, almost at a right angle. The quartermaster saw the schooner "just when it happened." A diagram drawn by him would indicate the angle of the collision to have been considerably more than a right angle.

Testimony coming from witnesses who, like the captain and pilot, charged with the navigation of a steamer running at high speed, strike a vessel they are bound to avoid, in broad daylight, without having taken any notice of her until they are on the point of striking her, is not testimony such as can be expected to convince the court that they would not have struck her at all but for an unexpected change of her course such as to bring her directly across their own. We think it evident, as did the District Court, that their attention had been directed solely to the Malden, and none of it given to the schooner until too late.

Their evidence fails to convince us that the steamer in fact struck the schooner at a right angle. With the exception of a diagram made by one witness, who was not taking any part in her navigation at the time, the evidence of all the witnesses from the schooner is to the contrary; nor do we think the argument from the nature of the injury to the schooner's hull, as ascertained after she was raised, strong enough to establish the fact. Going, as she was, nearly at full speed, the steamer could hardly strike a vessel so much smaller on the quarter without instantly swinging her around; and in view of this fact, neither the estimates of witnesses who had not observed the entire approach of the vessels as to the angle of collision, nor opinions form-

ed from examination of the injuries to the hull as to the "angle of the break," can have much weight.

The master of the schooner called at the Steamboat Company's office directly after the collision, on the same afternoon, and the appellant relies on admissions he is said to have then and there made regarding the manner in which the collision happened. The evidence is contradictory as to what was said and done at the time. We are not satisfied that any admissions were then made which materially conflicted with the master's testimony as summarized above. Neither the diagram which he admits having made, nor that made by Mr. Sherman and claimed to have been approved by him seem to us necessarily inconsistent with that testimony.

The alleged sudden change of course on the schooner's part is obviously one which she could have had no motive to make, but, on the contrary, every motive to avoid making. We do not think the evidence sufficient to prove that she ever made it. We therefore agree with the conclusions of the District Court. It is unnecessary to deal separately with each of the assignments of error.

The decree of the District Court is affirmed, with interest, and the appellees recover their costs of appeal.